IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| AMANDA J. JONES, | ) | CASE NO. 1:12CV02486 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL, | ) | |
| SECURITY ADMINISTRATION,[1] | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Amanda J. Jones ("Plaintiff" or "Jones") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental social security income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the Commissioner's decision should be **AFFIRMED**.

**I.  Procedural History**

Jones filed her applications for DIB and SSI on November 4, 2009.  Tr.136-138, 139-142.  In her applications, Jones alleged a disability onset date of October 19, 2009.  Tr. 136.  She alleged disability based on mood disorder.  Tr. 163.  After denials by the state agency initially

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to FED. R. CIV. P. 25(d), she is hereby substituted for Michael J. Astrue as the Defendant in this case.

1

and on reconsideration (Tr. 75-76), Jones requested a hearing (Tr. 83).   A hearing was held before Administrative Law Judge  ("ALJ") Valencia Jarvis on July 14, 2011.  Tr. 39-74.

In her August 24, 2011, decision, (Tr.11-26) the ALJ determined that Plaintiff's residual functional capacity ("RFC") did not prevent her from performing work existing in significant numbers in the national economy.  Tr. 14-22.  Jones requested review of the ALJ's decision by the Appeals Council. Tr. 9-10 .  On August 24, 2012, the Appeals Council denied Jones' request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.  Personal and Vocational Evidence

Jones was born on February 18, 1978, and was 33 at the time of the hearing Tr. 44, 136.  She completed school through twelfth grade, was not in special education classes, and obtained no further specialization.  Tr. 167.  Jones was single at the time of the hearing and resides with her two children, ages 8 and 9.  Tr. 51.  Her past employment included work as an adult day care worker, a cashier, hostess, food server, and child care attendant.  Tr. 164.   Jones last worked in 2008 for one day as a food server in a cafeteria.  Tr. 164.

### B.  Medical Evidence

#### 1.       Treating physician –  Rajendran Sundaram, M.D.

Prior to her disability onset date, Jones saw Dr. Rajendran Sundaram, M.D. periodically from 2006 to 2008, and was treated for anxiety and hypothyroidism.[2]  Tr. 238-247.  On October

---

[2] Plaintiff's medical records also show a December 2005 consultative exam with Ronald G. Smith, Ph.D., wherein Dr. Smith diagnosed Jones with depressive disorder NOS and personality disorder NOS with passive dependent features.  Tr. 220.  Dr. Smith also described Plaintiff's temperament as easily irritable, angry, and emotional.  Tr.

2

19, 2009, Plaintiff's alleged disability onset date, she presented to Dr. Sundaram reporting that she felt tired, lethargic, cold, intolerant, constipated, agitated, and anxious.  Tr. 240.  She also reported she had insomnia, difficulty controlling her thoughts, episodes of poor impulse control, and anger management issues.  Tr. 240.  Jones reported to Dr. Sundaram that she had been off Synthroid for a month due to an insurance lapse.  Tr. 240.  Dr. Sundaram's examination revealed a pleasant woman in no acute distress with no physical abnormalities.  Tr. 240.  He diagnosed Jones with mood disorder NOS and hypothyroidism.  Tr. 240.  He recommended Jones continue to take Synthroid for her hypothyroidism and recommended she start divalproex/Depakote ("Depakote")[3] for her mood disorder.  Tr. 241.  At a follow-up visit two weeks later, Plaintiff reported that she still felt anxious and jittery and continued to report insomnia and agitation.  Tr. 238.

In December 2009, Plaintiff returned to Dr. Sundaram reporting that the Depakote was not helping her agitation.  Tr. 269.  Dr. Sundaram diagnosed her with attention deficit disorder without hyperactivity and recommended she start Adderall.  Tr. 269.  He also noted it would be difficult to evaluate Plaintiff because "she's not much of a historian and her history is all over the place."  Tr. 269.  At a follow-up appointment the next month, Plaintiff stated that she stopped taking Adderall because she experienced some mild mania.  Tr. 271.  Dr. Sundaram diagnosed bipolar disorder and switched her medication to Tegretol.  Tr. 271.  In February 2010, Plaintiff reported feeling better after switching to Tegretol.  Tr. 343.

---

220. Later, in a March 2006 diagnostic assessment of Plaintiff's mental health at the Nord Mental Health Center, Plaintiff was diagnosed with adjustment disorder with mixed anxiety and depression moods.  Tr. 221-234.  Plaintiff's prior relevant medical history is provided for reference only; these medical records are not at issue in this case.

[3] Depakote is the brand name of divalproex sodium.  *See* Dorland's Illustrated Medical Dictionary, 31st Edition, 2007, at 497.  The parties and the record refer to the drug by both names at different times.  *See e.g.* Doc. 13, p.3 (Depakoke (sic)); Doc. 12., p.3 ([d]ivalproex); Tr. 238 (referred to as Depakote and later as divalproex sodium).  The Court will refer to the drug hereafter as Depakote.

The next month, Plaintiff returned to Dr. Sundaram stating that Tegretol was not helping her symptoms and that she still felt anxious.  Tr. 274.  Dr. Sundaram recommended Plaintiff continue Tegretol and begin Seroquel.  Tr. 275.  The following week, Dr. Sundaram increased her Tegretol dose.  Tr. 276.  By June 7, 2010, Plaintiff continued to report no progress relative to her medication.  Tr. 277.   That same day, Dr. Sundaram filled out a Medical Source Assessment in which he indicated that Jones was either incapable of performing any work or would have noticeable difficulty for more than 20 percent of the work day or work week in every category, including understanding and memory, sustained concentration and persistence, social interaction, and adaption.  Tr. 383-84.[4]  On June 23, 2011, Dr. Sundaram filled out a second Medical Source Assessment where he indicated improvements in Jones' ability to understand, remember, and carry out very short and simple instructions and in her ability to socially interact with others, but remarked that Plaintiff "has poor focus and concentration" and is "unable to maintain or perform a task for a reasonable length of time."  Tr. 400.

    **2.**    **State Agency Opinions**

        **a. State agency psychological consultative examining physician's opinion**

At the state agency's request, Plaintiff met with Ronald Smith, Ph.D., on March 29, 2010.  Tr. 348-354.  Dr. Smith found Plaintiff had a neat and clean appearance; she was cooperative; she initially seemed distracted and flustered, but settled down later in the interview; her thought process became better organized as she relaxed; she showed appropriate affective expression with good range of affect; she appeared alert and in good contact with reality; she was well oriented to time and place; and she had limited insight and judgment.  Tr. 351-352.  Regarding

---

[4] The Medical Source Statement was a mental health assessment form provided by Plaintiff's counsel to Doctor Sundaram.  Doc. 14, p.2. The categories are rated on a scale of increasing severity with 5 being the most severe and defined as "not able to perform a designated task or function on regular, reliable, and sustained schedule. " Tr. 383.

4

her functioning, Plaintiff reported that, on good days, she would watch television, do some cleaning, wait for her two girls to come home, make meals, help with the girls' homework, and shop for groceries. Tr. 352.

Dr. Smith diagnosed bereavement (due to her brother's passing), a dysthymic disorder, and an anxiety disorder not otherwise specified. Tr. 353. He assigned a GAF score of 48.[5] Tr. 353. Regarding her work-related mental abilities, Dr. Smith found that Plaintiff was moderately impaired in her ability to relate to co-workers, supervisors, and the general public; her ability to understand, remember and follow instructions; and her ability to maintain attention, concentration, and persistence in the performance of routine tasks. Tr. 353. He also found that her ability to withstand workplace stress was markedly impaired. Tr. 353.

### b. State agency psychological reviewing physicians' opinions

**Dr. Hoyle.** On April 13, 2010, state agency reviewing physician Dr. Tonnie Hoyle, Psy.D., reviewed the evidence and completed a Mental RFC Assessment. Tr. 355-357. Dr. Hoyle noted that Plaintiff's past psychological treatment was limited and she was currently being prescribed psychotropic medications by her primary care physician. Tr. 357. Dr. Hoyle also reviewed Dr. Smith's report and gave the opinions therein weight except for his conclusion that the Plaintiff was markedly impaired in her ability to withstand work pressures. Tr. 357. Dr. Hoyle noted that Plaintiff admitted to completing household chores, caring for her two school-age children daily, helping her children with their homework, and having no difficulty reading or responding to her mail. Tr. 357. Dr. Hoyle opined that Plaintiff had no more than a moderate

---

[5] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.*

limitation in withstanding work stress and pressures and that Plaintiff remained capable of completing simple to moderate tasks in a work environment that required no strict production demands and where changes could be explained.  Tr. 357.  Dr. Hoyle further opined that Plaintiff could interact socially in all settings but would do best with minimal contact with the public.  Tr. 357.

**Dr. Lewin.**  On July 17, 2010, on reconsideration, state agency psychologist Caroline Lewin, Ph.D., reviewed the medical evidence of record and noted that, since the initial denial, Plaintiff presented to the emergency room complaining of a panic attack.  Tr. 385.[6]  However, since the initial denial, Plaintiff alleged that her condition only changed with respect to her primary care physician increasing her medications.  Tr. 385.

With respect to Dr. Sundaram's medical source statement, Dr. Lewin noted that Dr. Sundaram's opinions were given no weight because they were not from an acceptable psychiatric treating source and they were "not at all supported by the objective evidence."  Tr. 385.  Dr. Lewin affirmed Dr. Hoyle's assessment at the initial level of review.  Tr. 385.

### C. Testimonial Evidence

#### 1. Jones' Testimony

At the administrative hearing, Jones was represented by counsel and testified that she was 33 years of age and felt she couldn't work because she gets very nervous, anxious, irritated and "would almost start to have a panic attack."  Tr. 45.  Plaintiff stated that she goes through high times where she gets irritated very easily and depressive episodes where she is tired and does not want to do anything, go anywhere, and sometimes can't leave the house.  Tr. 47.  On a typical

---

[6] The emergency room records reflect that Plaintiff was provided Ativan, which resolved her symptoms, and discharged within a couple of hours.  Tr. 375-379.

day, Plaintiff testified that she watched television, took a nap, and read a book. Tr. 63. She enjoyed watching movies in particular. Tr. 63. She lived with her two daughters, ages 8 and 9, but testified that their unemployed father came over all day, every day to help her. Tr. 45-46, 52-52. Plaintiff testified that she goes to Walmart to shop for DVDs and groceries with her brother or her children's father but that, unless it's on one of her "good days," the children's father does most of the shopping. Tr. 46-47, 63.

The ALJ asked Jones about her work history. Jones' most recent job was in 2008 when she worked for one day as a food server in a cafeteria. Tr. 53. Prior to that, Jones worked in February 2002 as a restaurant hostess. Tr. 44. Jones testified that she worked part time but was never called back to work after her maternity leave. Tr. 45. In 2000, Jones worked in a children's daycare and testified that she got fired after a parent complained that she got too forceful with one of the children. Tr. 55. Jones testified that she worked off and on, between 1997-2001, as a cashier at a drive-thru restaurant. Tr. 55. Also, in 1998 and 1999, Jones worked as an adult daycare worker but Jones testified she was fired from that job because she was caught sleeping on the job and not doing her work right. Tr. 57.

### 2. Vocational Expert's Testimony

Vocational Expert Ted Macy ("VE") testified at the hearing. Tr. 66-73. The VE testified to the exertional and skill level of Jones' past work. Tr. 67-68. He indicated that Jones' past work as a hostess was light and unskilled or semi-skilled. Tr. 67. The VE also indicated Jones' past jobs as a cashier and a food service worker were light, unskilled jobs. Tr. 68. Jones' past work as a child care attendant was classified by the VE as medium and semi-skilled whereas her past work as an adult care provider was classified as heavy and semi-skilled. Tr. 68.

7

The ALJ then asked the VE to assume an individual of Jones' age, education, and work experience with no exertional limitations who would be able to perform or complete simple to moderate tasks free of fast-paced-production requirements, where changes could be explained, and where there was no contact with the public and only brief and superficial contact with coworkers and supervisors and no concentrated exposure to hazards.  Tr. 67-68.  The VE testified such a hypothetical individual would not be able to perform any of Jones' past work.  Tr. 69.  The VE testified, however, that such an individual could perform unskilled medium work such as a laundry worker or hand packer and unskilled light work such as a wire worker or an electronics worker.  Tr. 69-70.

The VE was then questioned by Jones' attorney, who asked if there were jobs available to a person with an inability to withstand the pressures of work who needed to be absent from work multiple times in a month.  Tr. 72.  The VE responded negatively.  Tr. 72.  Next the attorney asked if there were jobs available for an individual who, because of the inability to withstand the pressures of work needed two to three 10 to 15 minute breaks though the day, and the VE again responded negatively.  Tr. 73.  Finally, Jones' attorney asked whether there were jobs that could be performed by an individual who, for 15-20% of the time, was unable to understand, remember, or carry out even short and simple instructions, and the VE responded "No."  Tr. 73.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

8

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920[7]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this sequential analysis, the claimant has the burden of proof

---

[7] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her August 24, 2011, decision, the ALJ made the following findings:

1. Jones has not engaged in substantial gainful activity since November 24, 2009, the application date. Tr. 16.

2. Jones has the following severe impairments: Bipolar Disorder; Anxiety; Depression. Tr. 16.

3. Jones does not have an impairment or combination of impairments that meets or medically equals the severity of the one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[8] Tr. 16.

4. Jones has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: She can perform or complete simple to moderate tasks free of fast paced production requirements where changes can be explained. She can have no contact with the public, and brief and superficial contact with coworkers and supervisors. She must avoid concentrated exposure to hazards such as moving machinery and unprotected heights. Tr. 18.

5. Jones is unable to perform any past relevant work. Tr. 20.

6. Jones was born on February 18, 1978 and was 31 years old, which is defined as a younger individual age 18-49, on the date the application was filed. Tr. 20.

7. Jones has at least a high school education and was able to communicate in English. Tr. 21.

---

C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[8] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

8. Transferability of job skills is not material to the determination of disability using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. Tr. 21.

9. Considering Jones' age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 21.

10. The Claimant has not been under a disability, as defined in the Social Security Act, since November 4, 2009, the date the application was filed. Tr. 22.

The ALJ's decision became the final decision of the Acting Commissioner when the Appeals Council confirmed it on August 24, 2012. Tr. 1.

### V. Parties' Arguments

#### A. Plaintiff's Arguments

Plaintiff argues that the ALJ failed to articulate a valid basis for rejecting the treating and consulting source opinions. Doc. 12, p.12. Plaintiff acknowledges that the ALJ did articulate specific reasons for the weight she assigned to the treating and consulting source opinions but asserts that the articulated reasons were not legitimate under the circumstances. Doc. 12, p.12. Plaintiff also argues the ALJ did not have substantial evidence to find that Plaintiff was capable of sustained full time work and did not meet the Commissioner's burden at Step Five of the Sequential Evaluation. Doc. 12, p.14.

#### B. Defendant's Arguments

In response, the Commissioner argues that substantial evidence supports the ALJ's evaluation of medical sources opinions, her RFC findings, and her credibility evaluations. Doc. 13, pp. 10-14.

11

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Secretary of Health and Human Services,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ properly articulated valid reasons for the weight provided to the medical opinion evidence

Plaintiff acknowledges that the ALJ articulated specific reasons for the weight she assigned to the opinions of the treating source and consultative examiner.  Doc. 12, p.12.  However, Plaintiff argues that the reasons specified by the ALJ were illegitimate under the circumstances and the opinions of the treating source and the consultative examiner were consistent and should have been given the greatest weight.  Doc. 12, p.12.

#### 1. The ALJ properly evaluated the opinion of Jones' treating physician

Plaintiff contends it was not proper for the ALJ to give more weight to the State agency medical and psychological consultants' opinions than those of Dr. Sundaram and the consultative examiner because the state agency consultants were nonexamining physicians.  Doc. 12, p.13. Plaintiff argues that the ALJ cannot decline to give the treating physician's opinion controlling

weight simply because another physician has reached a contrary conclusion. Doc. 12, p.13. Plaintiff's arguments are without merit and misstate the ALJ's analysis.

Generally, more weight is given to the opinions of treating physicians than to those of non-treating physicians. *Rogers v. Commissioner,* 486 F.3d 234, 242 (6th Cir.2007). Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). The Commissioner's regulations impose a clear duty always to give good reasons for the weight given to treating source opinions. *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011) (citing 20 C.F.R. §§ 404.1527(d)(2)). "Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted). The ALJ's opinion made clear that she did not find Dr. Sundaram's opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and found inconsistencies with other substantial evidence in the case record.

Contrary to Plaintiff's assertion, the ALJ did not state that she gave less weight to Dr. Sundaram's findings because another physician reached a contrary conclusion. Rather, the ALJ first found that Dr. Sundaram's conclusions in his Medical Source Assessments were not supported by examinations or notes. Tr.19. The Medical Sources Statements signed by Dr. Sundaram in June 2010 and June 2011 indicated that Plaintiff had extreme limitations in most

work-related mental functions.  Tr. 383-84, 399-400.  However, the ALJ found that both of these statements failed to provide reasons for Dr. Sundaram's conclusions as to Plaintiff's extreme limitations and his conclusions were contradicted by other evidence that indicated that Jones exhibited improvement.  Tr. 19.  Dr. Sundaram opined that claimant had poor focus and concentration but did not specify what examinations or notes supported such an opinion.  Tr. 19. Conclusory statements from physicians are properly discounted by ALJs.  *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir.2001) (stating that ALJs are "not bound by conclusory statements of doctors").

The ALJ also discounted Dr. Sundaram's assessment because it conflicted with other evidence in the record that indicated that Jones showed sustained improvement.  Although Dr. Sundaram found extreme limitations in most-work related activities, his notes indicated that Plaintiff felt better after taking her medications, could complete household tasks on her own, and had less anxiety and depression.  Tr. 19.  In fact, the ALJ noted that Dr. Sundaram's 2011 analysis showed that Plaintiff had greater abilities than in the 2010 analysis.[9]  Tr. 19-20.

Due to the lack of supportability and inconsistencies in Dr. Sundaram's opinion, it was proper for the ALJ to decline to give Dr. Sundaram's opinion controlling weight or the most weight.  While the ALJ gave little weight to Jones' treating physician's opinion, the ALJ's reasons are supported by the record and are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Cole*, 661 F.3d at 937.

---

[9] The June 2011 Medical Source Assessment indicated improvements in Jones' ability to understand, remember, and carry out very short and simple instructions and in her ability to socially interact with others.  Tr. 399-400.

14

### 2. The ALJ properly evaluated the opinion of the consulting examiner

Plaintiff argues that the ALJ failed to give appropriate weight to the opinion of the consultative examiner, Ronald Smith, Ph.D. Doc. 12, p. 13. Plaintiff also asserts that the ALJ "cherry picked" the evidence because the ALJ did not accept Dr. Smith's opinion as a whole. Doc. 12, p.13. Plaintiff's arguments are without merit.

First, the ALJ explained that she gave "great weight" to Dr. Smith's opinion, "except for the portion of his opinion that stated that the claimant had marked impairments in her ability to withstand stress and pressure of day-to-day work activity." Tr. 19. The ALJ provided good reasons for assigning little weight to Dr. Smith's marked limitation finding because it was inconsistent with his own examination during which Plaintiff settled into the interview, was calm and responsive when discussing her situation with the examiner, and demonstrated no unusual behaviors that would support a marked impairment in withstanding stress. Tr. 19. The ALJ concluded that the Plaintiff's documented demeanor during the examination and other evidence in the record supported only a moderate limitation in the ability to withstand work pressure. Tr. 20.

Plaintiff argues that the ALJ was not permitted to cherry pick the portions of Dr. Smith's opinion upon which she would focus. As noted by the Sixth Circuit, the so-called cherry picking of evidence by the ALJ "can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 284 (6th Cir.2009). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir.2001) (citation omitted). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* at 773 (citations omitted).

15

The ALJ's conclusion was supported by the state agency psychologist, Dr. Hoyle, who also discounted Dr. Smith's marked limitation and found a moderate limitation in the ability to handle work pressures. Tr. 357. The ALJ gave the opinions of the State reviewing consultants great weight as those "opinions were accompanied by detailed explanations, after a full review of the evidence. Additionally, the medical evidence of record substantiates the agency examiner's findings, and, as consultants of the Administration, the examiners are certainly well versed in the assessment of functionality as it pertains to the disability provisions of the Social Security Act, as amended." Tr. 19. The ALJ's treatment of these opinions demonstrates that her RFC assessment was based on a complete review of the record. Further, "an ALJ does not 'cherry pick' the evidence merely by resolving some inconsistencies unfavorably to a claimant's position." *Solembrino v. Astrue, No. 1:10–cv–1017, 2011 WL 2115872, at \*8 (N.D.Ohio May 27, 2011); Smith v. Comm'r of Soc. Sec.*, 1:11-CV-2313, 2013 WL 943874 (N.D. Ohio Mar. 11, 2013).

For the reasons set forth above, Jones' argument that the ALJ failed to articulate valid reasons for rejecting the treating and consulting source opinions is without merit.

### B.    The ALJ's Step Five determination is supported by substantial evidence.

Plaintiff's second and final argument is that the ALJ did not have substantial evidence to support a finding that the Plaintiff was capable of sustained full time work and, as such, did not meet the Commissioner's burden at Step Five of the sequential evaluation. Doc. 12, p. 14. Specifically, Plaintiff appears to argue that the ALJ should have accepted the vocational expert's testimony that no jobs would be available if the hypothetical individual could not withstand work stress, would be absent more than four times per month, and would require breaks in addition to customary break periods. Doc. 12, p.15. Plaintiff's argument lacks merit because

16

"[h]ypothetical questions . . . need only incorporate those limitations which the ALJ has accepted as credible." *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011)(citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). The ALJ relied on VE testimony in response to hypotheticals that incorporated the limitations that the ALJ determined were credible and supported by the record.

The ALJ determined with regard to credibility that claimant's alleged symptoms were not consistent with the medical record to the extent that she claimed to be unable to perform any work and because she was proven to be far less restricted than she claimed as evidenced by her daily activities. Tr. 20. The ALJ's credibility determinations are entitled to great deference because the ALJ had the "unique opportunity to observe" the witness's demeanor while testifying. *Buxton,* 246 F.3d at 773; *Jones v. Commissioner of Social Sec.,* 336 F.3d 469, 476; *Walters v. Commissioner of Social Sec.,* 127 F.3d 525, 531. On appeal, a reviewing court is "limited to evaluating whether or not the ALJ's explanations for [discrediting the witness] are reasonable and supported by substantial evidence in the record." *Jones,* 336 F.3d at 476. In this case, the evidence in the record was conflicting and required the ALJ to make a credibility determination. Considering the evidence as a whole, the ALJ concluded that Jones' allegations were not credible with regard to the extent of her daily limitations. Because the ALJ provided specific explanations for her credibility finding, and because her finding was within the zone of reasonable choices, her denial of Jones application for benefits must be affirmed. *See Buxton,* 246 F.3d at 773. Therefore, Jones' argument that the ALJ did not have substantial evidence and did not meet the Commissioner's burden at Step Five is without merit.

17

## VII. Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: October 21, 2013

*Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).